QUESTION:
Must the City of Hialeah receive referendum approval prior to the purchase of Hialeah Racetrack?
SUMMARY:
Premised upon described procedural and constitutional limitations and safeguards, the proposed purchase of Hialeah Racetrack by the City of Hialeah does not require a referendum pursuant to s. 7(b) of the Hialeah City Charter since the contractual and financial agreements relieving the city of any moral and/or legal responsibility and limiting any recourse to the property and to the lessee do not constitute the issuance of a true indebtedness within the meaning of said section.
Section 7(b) of the city charter provides that:
 The City of Hialeah shall not be able to issue any type of bonds, evidences of indebtedness or revenue certificates in excess of $500,000.00 without referendum. (Emphasis supplied.)
Section 166.111, F. S., of the Municipal Home Rule Powers Act, provides that:
 The governing body of every municipality may borrow money, contract loans, and issue bonds as defined in s. 166.101 from time to time to finance the undertaking of any capital or other project for the purposes permitted by the State Constitution and may pledge the funds, credit, property, and taxing power of the municipality for the payment of such debts and bonds. (Emphasis supplied.)
Section 166.101, F. S., provides that the term `project' embraces `any capital expenditure which the governing body of the municipality shall deem to be made for a public purpose. . . .' (Emphasis supplied.) See also s. 166.021, F. S., providing that municipalities `may exercise any power for municipal purposes, except when expressly prohibited by law.' (Emphasis supplied.) See
s. 7(a) of the city charter.
As I stated in AGO 076-209, based upon the above statutory provision, the city council has the authority to borrow money to finance the track purchase and to secure it with a mortgage [maximum 30 years at 6 percent] on the track if done so in a manner consistent with the applicable statutory and constitutional limitations. The city does not contend that it is within an exemption enumerated in s. 10(c) and (d), Art. VII, State Constitution. Section 10 generally prohibits the pledging of municipal credit or taxing power to aid private entities for other than municipal purposes. Thus, the city council must conclude that the transaction and track purchase will serve a `public purpose.' Bannon v. Port of Palm Beach Dist., 246 So.2d 737 (Fla. 1971).
The Florida Supreme Court in City of West Palm Beach v. Williams,291 So.2d 572, 578 (Fla. 1974), stated that a legislative finding that a proposed undertaking would serve a valid public purpose should not be disturbed absent a showing that it is arbitrary and unfounded. See State v. Reedy Creek Improvement District,216 So.2d 202 (Fla. 1968); State v. Daytona Beach Racing and Rec. Fac. Dist., 153 So.2d 34 (Fla. 1956); and State v. City of Jacksonville, 53 So.2d 306 (Fla. 1951). The proposed track purchase will be held constitutionally valid under s. 10, Art. VII, State Const., upon a sufficiently demonstrated determination that the public will be primarily benefited and any private persons only incidentally benefited.
In State v. Daytona Beach Racing Rec. Fac. Dist., supra, the public purpose aspect of the Daytona Beach Motor Speedway was unsuccessfully challenged as being predominantly for private purpose. The court refused, unless blatantly erroneous, to disregard the legislative conclusion that the speedway furthered `public purposes in promoting the economic, commercial and residential development of the District.' The court concluded that governmental ownership and operation of the speedway `would serve a valid public purpose.'
The Florida judiciary, on many occasions, has recognized the significant governmental revenue interest and public purchase in the Florida pari-mutuel industry. Gulfstream Park Racing Association, Inc. v. Board of Business Regulation, 318 So.2d 458
(1 D.C.A. Fla., 1975), cert. denied 322 So.2d 979 (Fla. 1975); West Flagler Association, Ltd. v. Board of Business Regulation,241 So.2d 369, 376 (Fla. 1970); Wilson v. Sandstrom, 317 So.2d 732
(Fla. 1975); Hialeah Racecourse, Inc. v. Gulfstream Park Racing Association, supra; Hubel v. West Va. Racing Commission,513 F.2d 243 (4th Cir. 1975). This state's goal of maximizing production of tax revenue was implicitly recognized in Calder Race Course, Inc. v. Board of Business Regulation, 319 So.2d 67 (1 D.C.A. Fla., 1975). The Hialeah track's economic situation was given significant judicial recognition in Gulfstream Park Racing Association v. Board of Business Regulation:
 The Board finds that it would not be in the best interest of the State if Hialeah Race Track closed its operation because that closing would adversely affect the entire thoroughbred industry within the State of Florida, and could have a deleterious effect on other revenue producing industries, not the least of which if Florida's tourist industry. Owners of horses are annually attracted to Florida's winter racing season because of the continuing operation of the three race tracks (Tropical racing at Calder, Hialeah and Gulfstream), and the Board finds in addition, that Hialeah stabled and raced an impressive list of the nation's leading thoroughbreds.
 The evidence further justifies the Board's apprehension that Hialeah's closing would adversely affect the breeding industry and tourism generally. [318 So.2d at 415-416.]
These judicial determination of the paramount public interest in the survival of the Hialeah track are buttressed by the 1975 legislative findings regarding the Florida thoroughbred pari-mutuel industry. See Chs. 75-42, 75-43, and 75-44, Laws of Florida.
Based upon these judicial and legislative determination of a predominant public purpose together with the submitted economic studies of the track's impact upon the city, the city council could properly find a `public purpose' in the track's purchase and is consistent with s. 10, Art. VII, State Constitution. It should also be noted that, in addition to the sales and ad valorem taxes generated by the track's operation, the track recently produced approximately $1,800,000 in pari-mutuel taxes.
The referendum restrictions imposed by s. 12, Art. VII, State Const., are applicable only when a municipality issues bonds, certificates of indebtedness, or any form of tax anticipation certificates, payable from ad valorem taxation and maturing more than 12 months after issuance. State v. County of Dade,234 So.2d 651 (Fla. 1970); Nohr v. Brevard County Educ. Fac. Author.,247 So.2d 304 (Fla. 1971). In Nohr, the court concluded that the possibility of the district's moral obligation to levy taxes or appropriate funds brought that bond issuance within the purview of s. 12.
The statements made in AGO 076-209 concerning the referendum under the Florida Constitution appear equally applicable to the subject of the referendum under the Hialeah City Charter.
The distinguishable facts presented here are: the lease-purchase arrangements between the city and Mr. Brunetti; the city's contractual arrangement not to have any legal or moral obligation to expend any municipal funds; and the financial arrangements whereby the lending institutions have agreed never to look to the city for any financial relief and to limit their recourse to Mr. Brunetti and the property. Thus, based upon the submitted agreements and data; the contractual assurances and references above, which preclude the city from having any legal or moral obligation to expend any municipal funds; together with the financial arrangements whereby the lending institutions have agreed never to look to the city for any financial relief, a true indebtedness cannot be deemed to have been `issued' by the city. Within the meaning of s. 7(b) of the city charter, clauses should be inserted in the agreement that clearly state that the city is not lending its credit, not pledging its tax power, and not financially liable for any nonpayment of the balance due to the lending institutions.
Prepared by: Staff